UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. James B. Clark, III |
| | : | |
| v. | : | Mag. No. 25-12158 |
| | : | |
| PT UNTUNG BERSAMA SEJAHTERA, a/k/a "UBS Gold," MICHAEL YAHYA, ICHA ANASTASIA, and CLAUDIO FOGALE | : : : : : | **CRIMINAL COMPLAINT** |

I, Special Agent Adrian Vlahovic, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

Continued on the attached page and made a part hereof:

s/*Adrian Vlahovic*
Adrian Vlahovic
Special Agent
Homeland Security Investigations
Department of Homeland Security

Special Agent Adrian Vlahovic attested to this Complaint by telephone pursuant to Fed. R. Crim. P. 4.1(b)(2)(A), on November 12, 2025.

HONORABLE JAMES B. CLARK, III
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

1

## ATTACHMENT A

### COUNT ONE
(Conspiracy to Commit Wire Fraud)

From in or around 2021, through in or around November 2025, in the District of New Jersey, and elsewhere, the defendants,

PT UNTUNG BERSAMA SEJAHTERA,
a/k/a "UBS Gold,"
MICHAEL YAHYA,
ICHA ANASTASIA, and
CLAUDIO FOGALE,

knowingly and intentionally conspired and agreed with each other and others to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Adrian Vlahovic, am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other items of evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### Introduction

1. HSI, Internal Revenue Service–Criminal Investigation ("IRS-CI"), and U.S. Customs and Border Protection ("CBP") have been investigating PT Untung Bersama Sejahtera, a/k/a "UBS Gold" ("UBS GOLD"), Michael Yahya ("YAHYA"), Icha Anastasia ("ANASTASIA"), Claudio Fogale ("FOGALE"), and others for their involvement in a large-scale customs duty and tariff evasion scheme. During the investigation, law enforcement determined that UBS GOLD—through its employees, agents, and representatives YAHYA, ANASTASIA, FOGALE, and others—engaged in a conspiracy to evade lawful duties and tariffs for shipments of jewelry to the United States.

2. To evade tariffs and duties, the defendants engaged in at least two related and overlapping schemes:

   a. From on or about January 1, 2021 through the present, the United States has imposed a duty on jewelry imported from Indonesia to the United States. UBS GOLD, headquartered in Indonesia, and the defendants have evaded that duty by shipping jewelry made in Indonesia to Jordan before sending it to the United States. The defendants falsely claimed that UBS GOLD jewelry had been manufactured in Jordan, which avoided the duty that would otherwise apply.

   b. Starting earlier this year, the United States imposed tariffs for the importation of goods into the United States from many different countries, including Indonesia and Jordan. To avoid those tariffs, the defendants began shipping scrap gold from the United States to Jordan, which they falsely claimed was gold jewelry that simply needed to be assembled or finished in Jordan. Instead, the defendants swapped the scrap gold for UBS GOLD jewelry made in Indonesia, which they then shipped from Jordan to the United States. The defendants falsely claimed that the jewelry had been

3

manufactured in the United States, so they could avoid paying the tariffs that would otherwise apply.

3. From in or around 2021 through in or around October 2025, the defendants caused UBS GOLD and its customers to avoid more than approximately $86,477,705.72 in duties and tariffs on more than $1.2 billion in jewelry shipments to the United States, including to New Jersey.

## Background

4. At all times relevant to this Complaint, unless otherwise indicated:

   a. UBS GOLD was a jewelry company headquartered in Surabaya, East Java, Indonesia.

   b. Company-1 was a jewelry company headquartered in Al Salt, Jordan.

   c. Company-2 was a jewelry company headquartered in Brooklyn, New York.

   d. YAHYA was an Indonesian citizen and resided in Indonesia. YAHYA was a co-owner and served as the Export Marketing Head of UBS GOLD, and periodically serviced customers in the United States market.

   e. ANASTASIA was an Indonesian citizen and resided in Indonesia. ANASTASIA served as a Senior Account Executive for UBS GOLD and was assigned to service customers in the United States market.

   f. FOGALE was an Italian citizen and resided in Italy. FOGALE was a UBS GOLD employee and representative assigned to service customers in the United States market.

## The Duty Evasion Scheme

*Scheme Background*

5. For years until in or around the end of 2020, Indonesia had duty-free treatment with the United States through the Generalized System of Preferences ("GSP") program. The GSP program expired on or about December 31, 2020, and was not reauthorized by Congress. Therefore, starting on or about January 1, 2021, the United States imposed duties on the importation of products from Indonesia pursuant to the Harmonized Tariff Schedule of the United States. Relevant here, the United

4

States imposed duties of approximately 5% to 5.5% on goods imported from Indonesia like gold necklaces, gold rope, and jewelry made or clad with precious metals.

6. During the relevant period, the United States maintained a Free Trade Agreement with Jordan, which eliminated duties on the shipment of many goods from Jordan into the United States, including gold necklaces, gold rope, and jewelry made or clad with precious metals.

7. While the GSP was in place, UBS GOLD generally shipped jewelry directly from Indonesia to its customers in the United States. After the GSP program expired, the defendants conspired with each other and others to transship UBS GOLD's Indonesian-made goods through Jordan, before they were imported into the United States, to avoid the U.S. duties that would otherwise apply. The defendants and their co-conspirators represented to CBP[1] and others that the goods were manufactured by Company-1 in Jordan, rather than UBS GOLD in Indonesia, and that they were therefore not subject to any duty when shipped to the United States.

8. However, the investigation revealed that the defendants' and their co-conspirators' claims were false and that the products were manufactured in Indonesia, not Jordan. Among other things, law enforcement learned that:

    a. When customers purchased jewelry from UBS GOLD, they rarely if ever communicated with anyone from Company-1. They placed orders with UBS GOLD (often with ANASTASIA and/or FOGALE), negotiated prices with UBS GOLD, sent payment confirmation to UBS GOLD (even though payments were made to Company-1's account), and discussed any product issues with UBS GOLD.

    b. UBS GOLD exerted control over the customer relationship. Customers would place orders with UBS GOLD; UBS GOLD would send an order sheet on its own letterhead; UBS GOLD would begin manufacturing the goods in Indonesia and then send the customer a "ready goods" email when they were ready to be shipped; and then UBS GOLD would ask clients to confirm a "fix" date for the gold once it arrived in Jordan.

    c. After customers placed orders from UBS GOLD, UBS GOLD would send a "proforma invoice" to Company-1, which stated that

---

[1] When goods are imported into the United States, they must be accompanied by an entry package for review by CBP, which generally includes certain customs forms, commercial invoices, packing lists, bills of lading, certificates of origin, and any other required records. Based on my training and experience and the investigation to date, CBP relies on that information to assess the admissibility and dutiable status of the merchandise.

the goods were "MADE IN INDONESIA." Company-1 would then send UBS GOLD a final invoice on Company-1's own letterhead that contained a slightly higher price and the false claim that the "above mentioned goods have been manufactured in our factory in Jordan," which UBS GOLD would then send to its customer.

d. Although the goods were shipped through Jordan, they generally spent more time being manufactured in Indonesia than they spent in Jordan, consistent with the fact that the goods were actually being made in Indonesia, not Jordan.

e. When customers switched from having items shipped directly from Indonesia to the United States to having items shipped through Jordan, the goods remained the same, even though a new company (Company-1) was now allegedly working on the goods.

*Communications in Furtherance of the Scheme*

9. The defendants also periodically discussed the scheme via interstate and foreign email and encrypted messaging applications. For example, in or around February and March 2023, ANASTASIA had an email discussion with a customer ("Customer-1"). ANASTASIA initially asked "How do you want to make the shipment? Direct to the US?" When Customer-1 was confused, ANASTASIA responded: "What I need to make sure with you is, since the GSP still expired, you will need to pay duty when we make a direct shipment. Would that be ok for you?" Customer-1 replied: "You said it could be shipped different way" and "let me know please." ANASTASIA then said "Yes we can" and "So we will ship through Jordan." Based on my training and experience and the investigation to date, I believe that ANASTASIA was indicating that UBS GOLD was manufacturing the goods in and shipping them from Indonesia, but was willing to ship them through Jordan to avoid the duty that would apply to shipments directly from Indonesia.

10. In or around August 2023, FOGALE, ANASTASIA, and other UBS GOLD employees had an email conversation with a customer ("Customer-2"). At one point, Customer-2 asked: "And for shipping, which is the best way to avoid duty- I believe through Jordan?" Customer-2 later followed up: "In terms of shipment, if we send via Jordan to NY, do we pay less duty? Last time we paid a lot in duty and I don't want to make that mistake." FOGALE responded: "If you go from Indonesia to Jordan, to USA you only pay commission and shipping (around 0.55/0.60 cents, all included)." Customer-2 confirmed, saying "let's do Indonesia to Jordan and final destination NY."

11. In or around September 2023, ANASTASIA and FOGALE were involved in an email chain with a customer ("Customer-3"). During the discussion, Customer-3 asked: "Is there any way that our cost (shipping and handling) will be

cheaper than Jordan?" Customer-3 then suggested "Maybe it will be cheaper if you ship directly from Indonesia." ANASTASIA replied: "But then you will need to pay the duty." Based on my training and experience and the investigation to date, I believe that ANASTASIA was indicating (with FOGALE on the same email chain) that UBS GOLD was manufacturing the goods but shipping them through Jordan to avoid the duty.

12. In or around September 2023, ANASTASIA, YAHYA, and FOGALE were involved in an email chain with a customer ("Customer-4"). Customer-4 reached out to ANASTASIA, YAHYA, FOGALE, and other UBS GOLD employees to complain that ever since Company-1 started sending packages with "made in Jordan" tags, the weights did not match the invoices. Customer-4 added: "We also completely understand we're (sic) you guys are and that you guys don't have full control since the packaging is in Jordan while you're in Indonesia." Based on my training and experience and the investigation to date, I believe that Customer-4 was indicating that Company-1 was negatively impacting the UBS GOLD-manufactured jewelry during the packaging process, and that UBS GOLD needed to fix it, which again indicated UBS GOLD's control over the entire process.

13. In or around January and February 2025, ANASTASIA communicated via email with a customer ("Customer-5"). After Customer-5 asked "the pros and cons" of sending products "through Jordan," ANASTASIA replied:

> Direct shipment
> Cons : you will need to pay the duty 5-6%
> Pro : the duty will be able to reimbursed back when the GSP renewed (we don't know yet when the GSP will be renewed, it depends on the new president)
>
> Through Jordan
> Pro : no duty, but there's the service charge USD 0.20/gr. The shipping cost is around 1% from the total value. Total cost will be around USD 0.70-0.80/gr
> Cons : this extra cost won't be back to you even though the GSP is renewed.

Customer-5 then responded: "Through Jordan sounds good to us." Based on my training and experience and the investigation to date, I believe that ANASTASIA was stating that UBS GOLD was manufacturing the goods, but she and Customer-5 agreed to ship them through Jordan to avoid the duty.

### The Tariff Evasion Scheme

*Scheme Background*

14. Earlier this year, the United States began imposing tariffs on shipments from certain countries, including Indonesia and Jordan. For example, for

Indonesia, on or about April 5, 2025, a 10% global tariff went into effect; on or about April 9, 2025, a 32% country-specific tariff rate for Indonesia went into effect; on or about April 10, 2025, the country-specific tariff was suspended until on or about July 9, 2025, which was later extended to on or about August 1, 2025; and on or about August 7, 2025, a 19% country-specific tariff rate was imposed for Indonesia.

15. With respect to Jordan, on or about April 5, 2025, a 10% global tariff went into effect; on or about April 9, 2025, a 20% country-specific tariff rate for Jordan went into effect; on or about April 10, 2025, the country-specific tariff was suspended until on or about July 9, 2025, which was later extended to on or about August 1, 2025; and on or about August 7, 2025, a 15% country-specific tariff rate was imposed for Jordan.

16. On or about April 10, 2025, FOGALE emailed ANASTASIA and bcc'd numerous UBS GOLD customers. In the email, FOGALE solicited feedback from UBS GOLD customers on how they were "internally handling the issue of the increased tariff on products imported into the United States." UBS GOLD, Company-1, Company-2, and others then began developing a new way to import jewelry to avoid the tariff, which involved: (1) sending scrap gold from Company-2 in the United States to Jordan; (2) swapping the scrap gold out for UBS GOLD jewelry made in Indonesia; (3) shipping the UBS GOLD jewelry back to UBS GOLD customers in the United States; and (4) then falsely claiming to CBP that the jewelry was manufactured in the United States.

17. In one example, in or around June 2025, when a UBS Gold customer asked when one of its shipments would arrive, a UBS Gold employee responded "This order was shipped to [Company-1] yesterday. It was waiting for the new way shipment to avoid 10% tariff[.]"

18. In multiple emails in or around August 2025, Company-1 asked a customs broker whether this type of scheme was permissible. That customs broker then asked a CBP official in the United States about the scheme and passed on the official's response to a Company-1 executive, who then forwarded it to UBS GOLD employees, including YAHYA. Among other things, the CBP official indicated that there were problems with obtaining fine gold bars and alloy from a United States-based producer, shipping the gold and alloy to another country to manufacture jewelry, and then saying that the jewelry was from the United States and not subject to the foreign country's tariff. The CBP official stated that (i) it would not be verifiable that U.S.-originated gold was used in the jewelry, and (ii) turning the gold or alloy from the United States into jewelry in a foreign country would substantially transform it and render the jewelry subject to tariffs. The CBP official even stated that customers who did so would be "treading on thin ice." Nevertheless, UBS GOLD, Company-1, and their customers continued with the scheme.

19. Indeed, during the investigation, law enforcement lawfully obtained recordings of the defendants discussing their duty and tariff evasion efforts with each other and others. Among other things, YAHYA, FOGALE, and ANASTASIA engaged in discussions in which they explained that they would, in sum and substance, ship scrap gold from the United States to Jordan, swap it out for completed UBS GOLD jewelry, and then ship the jewelry to the United States and claim that it was made in the United States. At one point, UBS GOLD even had to remove stamps on certain pieces of jewelry indicating that they had been made in Jordan, because UBS GOLD wanted to claim they originated in the United States.

### *Inspections of Outgoing and Incoming Packages*

20. In recent months, CBP has inspected numerous packages shipped by Company-2 to Company-1, and then from Company-1 to customers in the United States. Company-2 claimed that the outbound shipments contained "Unfinished Gold chains to be assembled" that were "Made in USA." A representative invoice is pictured below, with the relevant text circled in red:



21. When CBP inspected the outgoing packages, they found what was effectively scrap gold. For example, a representative photograph of an outgoing shipment from in or around July 2025 is pictured below:



22. Shortly thereafter, Company-1 sent corresponding packages of jewelry to customers in the United States, some of which CBP inspected. In the return packages, Company-1 generally included an invoice on its own letterhead that referred to the Company-2 invoice numbers for the outbound packages, to indicate that the outbound gold was used to make the inbound jewelry. These invoices falsely stated: "We hereby certify that above mentioned goods are of United States of America Origin." Based on my training and experience and the investigation to date, the inbound packages from Company-1 contained jewelry that was not made from the corresponding outbound scrap gold.[2,3] A representative photograph of the contents of an inbound shipment is pictured below:

---

[2] At least some of Company-1's paperwork indicated that the goods contained in the inbound shipments were packaged either on or even before the dates of the corresponding outbound shipments, which further indicates that the outbound gold was not used to make the inbound jewelry.

[3] Based on my training and experience and the investigation to date, even if the outbound scrap gold *was* used to make the finished inbound jewelry, the materials underwent a substantial transformation that would render Jordan the country of origin, not the United States.



23. Similarly, on or about September 3, 2025, CBP officials inspected another outbound shipment from Company-2 to Company-1. That shipment included what appeared to be gold metal rods, a photograph of which is below.



Based on my training and experience and investigation to date, I believe that the gold metal rods further indicate that Company-2 is not sending ready-made gold jewelry for "assembly" in Jordan.

### *Recent Search Warrants*

24. Law enforcement recently executed a search warrant at Company-2. Among other things, law enforcement uncovered packages that were in preparation to be sent to Company-1. Those packages contained invoices and labels that indicated that the materials being shipped were specific kinds of jewelry, when in fact they were not.

25. For example, the below invoice and labels claimed that the package contained—referring to different styles of jewelry chain—Miami, Figaro, Franco, tubing, and/or fancy chains and bracelets:



Based on my training and experience and investigation to date, I believe that these materials were not in fact Miami, Figaro, Franco, tubing, or fancy chains and bracelets.

26. Law enforcement also recently executed search warrants on numerous packages shipped by Company-2 in the United States to Company-1 in Jordan. Those packages likewise contained invoices and labels that indicated that the materials being shipped were particular kinds of jewelry, when in fact they were not.

27. For instance, the below package contained an invoice and label stating that it contained "box chain[s]."



Based on my training and experience and investigation to date, I believe that these materials were not in fact box chains.

28. Similarly, another package contained invoices and labels stating that the package contained curb bracelets, when it actually contained the following:



Based on my training and experience and investigation to date, I believe that these materials were not in fact curb bracelets.

## Conclusion

29. At least until this week, UBS GOLD, Company-1, Company-2, and certain customers conspired to falsely claim to CBP that shipments of Indonesia-made UBS GOLD jewelry were manufactured in the United States and merely assembled in Jordan, thereby circumventing the tariffs and duties that would otherwise apply.

30. UBS GOLD's officers, directors, employees, and agents—including YAHYA, ANASTASIA, FOGALE, and others—committed the charged offense within the course and scope of their employment and agency for UBS GOLD and with the intent, at least in part, to benefit UBS GOLD.